**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BRADFORD O. BRYANT,

       Petitioner,                                    No. C 05-00723 JSW

  v.

ANTHONY KANE, Warden                          **ORDER DENYING PETITION**
                                              **FOR WRIT OF HABEAS CORPUS**
       Respondent.
_____/

**INTRODUCTION**

Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Bradford O. Bryant ("Bryant"). The petition is now ripe for consideration on the merits, and, for the reasons set forth below, the Petition is DENIED.

**BACKGROUND**

**A.     Procedural History.**

On March 26, 1980, Bryant pled guilty to one count of murder in the second degree. (Petition ("Pet."), Ex. C.) On April 24, 1980, Bryant was sentenced to an indeterminate sentence of fifteen years to life. (Answer, Ex. 9.) Bryant does not contest the validity of his conviction. Rather, he seeks habeas relief on the ground that he has been denied parole unlawfully and that his sentence has been improperly executed. (Traverse at 5.) Specifically, Bryant challenges former Governor Gray Davis's February 21, 2003, decision in which the former Governor reversed the Board of Prison Term's ("Board") decision finding Bryant suitable for parole (Pet., Ex. B.)

1        On May 23, 2003, the Superior Court for the State of California, County of San Diego,

2   denied Bryant's state habeas petition with respect to the former Governor's decision on the

3   grounds that: (1) the decision did not violate the *ex post facto* clauses of the United States and

4   California Constitutions; (2) the decision did not violate Bryant's due process rights; (3) the

5   decision was supported by "some evidence;" and, (4) the decision did not violate the terms of

6   Bryant's plea agreement.  (Answer, Ex. 9.)

7        On March 15, 2004, the state appeals court denied his petition on the grounds that: (1)

8   the former Governor's decision did not violate the *ex post facto* clause of the California

9   Constitution; (2) Bryant did not have a liberty interest in parole; (3) the decision did not violate

10  the terms of Bryant's plea agreement; and, (4) the decision was supported by "some evidence."

11  (*Id.*, Ex. 7.)  On January 18, 2005, the California Supreme Court summarily denied review.

12  (*Id.*, Ex. 8.)

13       On February 17, 2005, Bryant timely filed the instant petition.  On March 27, 2006, the

14  Court denied Respondent's motion to dismiss, in which Respondent contended that Bryant did

15  not have a federally protected liberty interest in parole.  (*See* Docket No. 14.)  Respondent filed

16  his Answer on April 26, 2006.  On June 8, 2006, Bryant filed his Traverse.

17  **B.    Factual Background.**

18       The following facts are derived from the exhibits submitted in support of the parties'

19  pleadings in this case.  Although Bryant does not challenge his conviction, the facts underlying

20  that conviction are pertinent to the resolution of his habeas petition.  Those facts, as found by

21  the Superior Court of California, are as follows:

22       While Gerald Kohlstaedt, the husband of Petitioner's ex-wife (Beverley
         Kohlstaedt), was leaving for work early one morning, Petitioner waited outside
23       Mr. Kohlstaedt's home armed with a knife.  Mr. Kohlstaedt had intended to
         make a police report alleging that Petitioner had raped Ms. Kohlstaedt's teenage
24       daughter.  A fight ensued.  Petitioner, who is much larger than Mr. Kohlstaedt,
         picked up Mr. Kohlstaedt and threw him across a parked car.  Petitioner then
25       stabbed Kohlstaedt approximately 14 times in the back, neck, chest and arms.
         Petitioner then picked up a 76-pound rock and dropped it on Mr. Kohlstaedt's
26       head, badly distorting and flattening Petitioner's [sic] face, and leaving him to
         die beside his home.  Petitioner thereafter rang the Kohlstaedt's doorbell and told
27       his ex-wife, Ms. Kohlstaedt, there had been an accident and he needed to use her
         restroom to wash-up.  Petitioner then fled before sheriff's deputies arrived.  The
28       sheriff's deputies left the scene after talking with Ms. Kohlstaedt without
         knowing that Mr. Kohlstaedt was laying on the side of the house.  Petitioner then

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

1

met a co-worker at a gas station, gave him a note resigning from his job and authorizing the co-worker to obtain his final paycheck.

Meanwhile, Ms. Kohlstaedt noticed that her husband's car remained in front of their home and called his work only to find that Mr. Kohlstaedt had not arrived. It was not until about 1:00 p.m. that Ms. Kohlstaedt found her husband's body on the side of the home.  Mr. Kohlstaedt died from cerebral lacerations and hemorrhages, multiple skull fractures, and multiple stab wounds to the check [sic] and back.

Two days later, Petitioner called Ms. Kohlstaedt demanding money, threatening to harm the children and to implicate her in the murder if she did not comply and meet him at a bar with the money.  Ms. Kohlstaedt called the Sheriff's Department and deputies found Petitioner at the bar waiting for Ms. Kohlstaedt to arrive, at which time he was arrested.

(See Answer Ex. 9.)[1]

Bryant was arrested and pled guilty to second degree murder on March 26, 1980.  (Pet., Ex. C.)  The plea form initialed and signed by Bryant states that "his attorney has explained the possible sentence and understands that the maximum possible punishment to be: 15 years to life (parole after 10 years with credit under law for time served in the County Jail since his arrest)."  (*Id.*, ¶ 10.)

After Bryant became eligible for parole, the Board found him unsuitable for parole on nine occasions.  (Traverse at 4.)  In his tenth parole hearing, on September 27, 2002, the Board found Bryant suitable for parole.  (Answer, Ex. 2 at 36.)  The Board noted that Bryant had no juvenile record of assaulting others, had a "stable social history as exhibited by reasonably stable relationships with others," and had "enhanced his ability to function within the law upon release through participation in education programs, self-help and or therapy programs noting 14 years of participation in Alcoholics Anonymous and institutional job assignments."  (*Id.*)  The Board also found that Bryant committed the crime as a result of significant stress in his life, he had a reduced probability of recidivism because of "maturation, growth, greater understanding and or advanced age," and had "realistic parole plans" based on his "job offer and or family support."  (*Id.* at 36-37.)  In finding that Bryant was a "low" danger to society, the Board cited a psychiatric report from October 31, 2000 and noted how he had demonstrated his

---

[1]      Exhibit 9 consists of approximately 64 pages of documents pertaining to Bryant's state habeas petitions.  The Superior Court opinion begins at page 44 of the exhibit.

1   self-control through positive institutional behavior.  (*Id.*)  On January 27, 2003, the Board's

2   Decision Review Committee affirmed the hearing panel's decision but informed Bryant that the

3   Board's decision was subject to review by the Governor of California.  (Pet., Ex. F.)

4          On February 21, 2003, former Governor Davis reversed the Board's decision to grant

5   Bryant parole.  (Pet., Ex. B.)  Governor Davis explained his decision as follows:

> In finding Mr. Bryant suitable for parole, the hearing panel found that he murdered Mr. Kohlstaedt as a result of significant stress in his life.  I disagree.  The Board gave no explanation for this conclusion.  However, the record indicates that Mr. Bryant killed Mr. Kohlstaedt to prevent him from reporting allegations that Mr. Bryant raped Ms. Kohlstaedt's teenage daughter.  This certainly is not a factor mitigating the crime or evidencing suitability for parole.
>
> To the contrary, Mr. Bryant committed an especially heinous crime that demonstrated utter disregard for human suffering.  He armed himself with a knife, went to Mr. Kohlstaedt's home, and laid in wait.  This evidences planning and premeditation.  His victim was particularly vulnerable – unsuspecting and, according to reports, significantly smaller in stature.  Mr. Bryant threw Mr. Kohlstaedt across a car and then attacked him repeatedly with the knife.  He stabbed with such force that he broke the blade in his victim's back on the second or third stab, yet continued stabbing with what was left of the knife at least 10 more times.  He has admitted that after doing sufficient damage with the knife to kill Mr. Kohlstaedt, he nevertheless picked up a 76-pound rock and crushed Mr. Kohlstaedt's skull.  Police reports indicate that the victim's face was "badly distorted and flattened."  These are egregious acts far beyond the minimum necessary to sustain a conviction of second degree murder.  Indeed, Mr. Bryant's premeditation and lying in wait would support first degree murder with special circumstances.
>
> Mr. Bryant's actions after the vicious attack also demonstrate his lack of remorse and continuing danger.  Rather than call for medical assistance, he went into the victim's home to clean up.  He lied to the victim's wife about what had happened, thereby preventing her from helping Mr. Kohlstaedt.  He then fled, leaving his victim to die.  Two days later, Mr. Bryant contacted his ex-wife and threatened her and her children and attempted to extort money from her.
>
> Mr. Bryant has refused to assume adequate responsibility for his crime.  While he claims he killed Mr. Kohlstaedt in self-defense, he had many opportunities to walk away, but chose to continue his attack.  For instance, after he threw Mr. Kohlstaedt across the car, rather than run away he attacked Mr. Kohlstaedt with the knife.  And rather than stab Mr. Kohlstaedt once to debilitate him, Mr. Bryant mutilated him with repeated stabs, evidencing an intent to kill.  By his own admission, he did enough damage with the knife to kill Mr. Kohlstaedt, yet he then picked up a rock and crushed his victim's skull.  Furthermore, Mr. Bryant was significantly bigger than his victim.  The record indicates that Mr. Kohlstaedt had a knife attached to his belt that he did not use against Mr. Bryant.  These facts show that Mr. Bryant was the aggressor, contradicting his claim of self-defense.

Moreover, Mr. Bryant has repeatedly attempted to blame others for Mr. Kohlstaedt's death. During his first 12 years in prison, he denied dropping the rock on Mr. Kohlstaedt's head. He even suggested that Ms. Kohlstaedt picked up the 76-pound rock and crushed her husband's skull. He also attempted to justify his failure to call for medical help by claiming that he told Ms. Kohlstaedt that her husband was outside dying. He said he assumed she would call for help, but she decided to let her husband die. These attempts to blame others and minimize his culpability evidence a continuing lack of remorse.

I also disagree with the Board's determination that Mr. Bryant has a stable social history. To the contrary, the record shows that he lived a life of violence, substance abuse, and criminality. He admits that during high school, he strangled a fellow student nearly to death in a fit of rage. He dropped out of school after tenth grade. He began drinking as a teenager and soon developed an alcohol problem. He spent six months in the Navy's Alcohol Rehabilitation Center and then attended Alcoholics Anonymous for seven months, yet continued drinking. Police arrested him at least four times for driving under the influence. He has admitted that if he had not been in jail for murdering Mr. Kohlstaedt, he likely would have committed vehicular manslaughter eventually. Over the years, he was arrested for several other crimes, including rape, assault with a deadly weapon, burglary, robbery, carrying a concealed weapon without a license, and altering identification on a firearm. He was placed on probation twice, yet failed to reform.

Two previous hearing panels found that Mr. Bryant needs therapy in order to face, understand and cope with stress in a nondestructive manner. The prior panels concluded that until progress is made, he continues to be unpredictable and a threat to others. Yet Mr. Bryant has received no therapy since these findings. In fact, he has not participated in any anger control, stress management, or behavior programs during his entire incarceration. Given the vicious nature of his crime and his history of violence, I believe Mr. Bryant requires additional time to comply with the prior panels' recommendation before he reenters society.

I note too that Mr. Bryant's parole plans are inadequate. To ensure that he will be able to support himself and succeed on parole, he should secure a viable job offer prior to his release. This is of particular concern given Mr. Bryant's termination from the Men's Advisory Council for refusing to work effectively within the established guidelines and his recent poor work reports.

Overall, Mr. Bryant has adjusted fairly well to prison and has made some commendable gains. He has maintained close family ties. He participated in Alcoholics Anonymous for several years.

Nevertheless, I agree with the San Diego District Attorney's Office and the San Diego Sheriff's Department that Mr. Bryant continues to pose an unreasonable danger to society. His life outside of an institutional setting is flagged with repeated failures to benefit from attempts to correct his substance abuse and criminality. His crime demonstrates his potential for extreme and senseless violence. Indeed, this was a brutal murder committed by a very dangerous individual. Mr. Bryant's planning, premeditation, extreme violence and subsequent threats to the victim's family members involve particularly egregious conduct.

1  (Pet., Ex. B.)

2                               **GROUNDS FOR RELIEF**

3        Bryant raises four claims in his Petition.  First, he argues that the former Governor's

4  reversal violates the *ex post facto* clauses of the California and United States Constitution.  Second,

5  he claims that the former Governor's decision violates the terms of his plea agreement because the

6  parties to the agreement understood that he would be released on parole after ten years in custody.

7  Third, Bryant claims that he is being denied a liberty interest in parole.  Fourth, he argues that the

8  former Governor's reversal was arbitrary by relying on his commitment offense and prior conduct

9  while not adequately weighing the mitigating factors.

10                                    **ANALYSIS**

11 **A.    Standard of Review.**

12       This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

13 custody pursuant to the judgment of a state court only on the ground that he is in custody in

14 violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also*

15 *Rose v. Hodges*, 423 U.S. 19, 21 (1971).  The Ninth Circuit has applied § 2254(d) to review of

16 parole suitability decisions.  *See, e.g, Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007); *Rosas v.*

17 *Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *see also McQuillion v. Duncan*, 306

18 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of

19 review under section 2254 applies to such decisions).  Because the petition in this case was filed

20 after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

21 AEDPA's provisions apply.  *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

22       Under AEDPA, this Court may grant the petition with respect to any claim that was

23 adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

24 resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

25 established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

26 a decision that was based on an unreasonable determination of the facts in light of the evidence

27 presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529

28 U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address the merits of a

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   particular claim, but may simply deny a habeas application on the ground that relief is precluded by

2   28 U.S.C. § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is the habeas petitioner's

3   burden to show he is not precluded from obtaining relief by § 2254(d).  *Woodford v. Visciotti*, 537

4   U.S. 19, 25 (2002).

5           "Clearly established federal law, as determined by the Supreme Court of the United States"

6   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

7   the relevant state-court decision."  *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085,

8   1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's

9   last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001).  "Section

10  2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."

11  *Williams*, 529 U.S. at 412.  The Supreme Court has explained repeatedly that AEDPA, which

12  embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential

13  standard for reviewing state-court determinations.  *See id.* at 436.  Thus, that Court has emphasized

14  that "[a] federal court may not overrule a state court for simply holding a view different from its

15  own, when the precedent from [the Supreme] Court is, at best, ambiguous."  *Mitchell v. Esparza*,

16  540 U.S. 12, 17 (2003) (per curiam).

17          Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ

18  only if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court]

19  cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the

20  Supreme Court and nevertheless arrives at a different result."  *Early v. Packer*, 537 U.S. 3, 8 (2002)

21  (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause of section

22  2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal

23  principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of

24  the prisoner's case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25  simply because that court concludes in its independent judgment that the relevant state-court

26  decision applied clearly established federal law erroneously or incorrectly.  Rather, that application

27  must also be unreasonable."  *Id.* at 412.  The objectively unreasonable standard is not a clear error

28  standard.  *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert.*

*denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

In this case, the California Court of Appeal denied Bryant's petition in a reasoned decision. (Answer, Ex. 7.) The California Supreme Court then summarily denied his petition. (Answer, Ex. 8.) Accordingly, this Court will "look through" the California Supreme Court's decision to the California Court of Appeal's decision in deciding whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law.

**B.     Legal Standards Applicable to Parole Suitability Determinations.**

California's parole scheme is set forth in California Penal Code § 3041, *et seq.* Section 3041(a) provides, in pertinent part:

> In the case of any inmate sentenced pursuant to any provision of law ... [o]ne year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissions shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. ... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.

Cal. Penal Code § 3041(a).

Penal Code section 3041(b) provides in pertinent part:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity

United States District Court

For the Northern District of California

of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Pen. Code § 3041(b).

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria for determining whether an inmate is suitable for release on parole. The opening paragraph of Section 2402(a) states:

Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) of these regulations provides:

All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

United States District Court

For the Northern District of California

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402©.

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder. The matrix provides three choices of suggested base terms for several categories of crimes. *See id.* § 2403. For second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years, depending on some of the facts of the crime.[2]

Although the matrix is to be used to establish a base term, an inmate's base term is set only when he or she has been found suitable for parole. *In re Dannenberg*, 34 Cal. 4th 1061, 1087 (2005). Thus, the statutory scheme places individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity. *Id.* at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

*Id.* at 1070 (emphasis, brackets, and parentheses as in original).

California law also added a layer of review in the parole process by giving the Governor the power to review the Board's decision. Cal. Penal Code § 3041.2. The Governor may affirm, modify, or reverse the Board's decision, but only based on the same factors the parole authority is required to consider. Cal. Const. art. V, § 8(b); *In re Rosenkrantz*, 29 Cal. 4th 616, 660-61 (2002), *cert. denied*, 538 U.S. 980 (2003) ("[T]he Governor's review is limited to the same considerations that inform the Board's decision.").

---

[2] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," and "no prior relationship." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," and "severe trauma." Each of the choices are further defined in the matrix. *See* 15 Cal. Code Regs. § 2403©.

**United States District Court**
For the Northern District of California

1    In sum, the Governor and "the Board, exercising its traditional broad discretion, may protect

2    public safety in each discrete case by considering the dangerous implications of a life-maximum

3    prisoner's crime individually." *Dannenberg*, 34 Cal. 4th at 1071. The California Supreme Court's

4    determination of state law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S.

5    624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

6        The California Supreme Court also has determined that the facts of the crime can alone

7    support a sentence longer than the statutory minimum even if everything else about the prisoner is

8    laudable. "While the board must point to factors beyond the minimum elements of the crime for

9    which the inmate was committed, it need engage in no further comparative analysis before

10   concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the

11   prisoner's release." *Dannenberg*, 34 Cal. 4th at 1071; *see also Rosenkrantz*, 29 Cal. 4th at 682-83

12   ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"

13   but might violate due process "where no circumstances of the offense reasonably could be

14   considered more aggravated or violent than the minimum necessary to sustain a conviction for that

15   offense").

16   **C.    The Former Governor's Decision Did Not Violate *Ex Post Facto* Constitutional**
         **Principles.**

17

18       Bryant contends that the former Governor's decision violated the *ex post facto* clauses of the

19   California and United States Constitutions because he committed the offense prior to the adoption of

20   Article V, section 8(b). *See* U.S. Const., art. I, § 10; Cal. Const., art. I, § 9. In 1988, Article V,

21   section 8(b) of the California Constitution was amended to give the Governor the power to review

22   parole decisions made by the Board. The United States Supreme Court has not ruled directly on

23   whether or not the Governor's power to reverse the Board's decision violates the *Ex Post Facto*

24   Clause. However, the Supreme Court has considered whether retroactive application of a California

25   statute, which amended parole procedures to allow the Board to decrease the frequency of parole,

26   violated the *Ex Post Facto* Clause. *California Dept. of Corrections v. Morales*, 514 U.S. 499

27   (1995).

28

**United States District Court**
For the Northern District of California

1    In *Morales*, the Supreme Court found that the amendment did not increase the punishment attached

2    to the respondent's crime, but "simply 'alters the method to be followed' in fixing a parole release

3    date under identical substantive standards." *Id.* at 508 (quoting *Miller v. Florida*, 482 U.S. 423, 433

4    (1987)).

5           Here, the state appellate court found that the former Governor's decision did not violate *ex*

6    *post facto* principles.  (Answer, Ex. 7.)  The court reasoned that the statute "did not change the

7    substantive standard governing the grant or denial of parole, rather it created a new level of review

8    within the executive branch." *Id.* (citing *Rosenkrantz*, 29 Cal. 4th at 638).  The court's reasoning

9    mirrors that of *Morales*, and therefore this Court holds that it was not contrary to clearly established

10   federal law.  *See also Johnson v. Gomez,* 92 F.3d 964, 967 (9th Cir. 1996) (holding that the

11   California law authorizing the governor's review did not violate the *Ex Post Facto* Clause).

12   **D.      The Decision to Deny Parole Did Not Violate the Terms of Bryant's Plea Agreement.**

13          Bryant also claims that the former Governor's decision to find him unsuitable for and deny

14   him parole violates the terms of his plea agreement.  In reaching its conclusion on this claim, the

15   state appellate court stated, "Bryant was not promised parole after 10 years in prison.  His sentence

16   is indeterminate and his suitability for parole is based on many factors, including his post-sentence

17   circumstances."  (Answer, Ex. 7.)  Relying on *Buckley v. Terhune*, 441 F.3d 688 (9th Cir. 2006), and

18   *Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003), Bryant argues that the decision to deny parole

19   violated his due process rights to enforce the terms of his plea agreement.

20          In *Buckley*, the Ninth Circuit noted that "[u]nder *Santobello v. New York*, 404 U.S. 257, 261-

21   62 (1971), a criminal defendant has a due process right to enforce the terms of his plea agreement."

22   *Buckley*, 441 F.3d at 694.  The court further noted that "it [has] been clearly established federal law

23   ... that the construction and interpretation of state court plea agreements 'and the concomitant

24   obligations flowing therefrom, are, within broad bounds of reasonableness, matters of state law.'" *Id.*

25   at 695 (quoting *Ricketts v. Adamson*, 483 U.S. 1, 6 n.3 (1987)).  Therefore, "under *Adamson*,

26   California courts are required to construe and interpret plea agreements in accordance with state

27   contract law." *Id.* at 965.

28

United States District Court

For the Northern District of California

In *Buckley*, the defendant initialed a paragraph in a felony disposition statement stating that he understood he could be sentenced under a plea bargain to "a maximum possible term of 15 year(s)," with a possible "parole period of life." 441 F.3d at 691. The record included conflicting statements that the plea bargain actually called for a maximum term of "fifteen years to life," which was the sentence the defendant ultimately received. *Id.* at 691-93. Thus, there was a discrepancy as to whether an indeterminate sentence had been intended.

The Ninth Circuit noted that the state court "made no mention or reference to state contract law" when it denied Buckley's state habeas petition. The Ninth Circuit concluded that it "failed to apply controlling state law and reached a decision that both in its mode of analysis and its result was contrary to clearly established Supreme Court law." *Id.* at 696. The court then undertook to apply the correct legal principles to the plea agreement, found that it was ambiguous and that it should be interpreted in a way most favorable to the defendant. *Id.* at 697-700. Accordingly, the court affirmed the district court's decision to grant the petition for a writ of habeas corpus.

In *Brown*, the court also found that the petitioner's due process rights to enforce the terms of her plea agreement had been violated. In that case, the prosecutor made an explicit promise to the defendant during the plea colloquy that she would only serve half her term if she remained discipline-free. 337 F.3d at 1157-58 ("Now, if you behave yourself at the state prison . . . you are going to get out in half the time. You get half of that 15 years off, or half of that 17 years off with the imposition of the extra two years, for good time/work-time credits.") The Ninth Circuit concluded that these explicit statements during the colloquy constituted binding promises as part of a contract. Because the only appropriate remedy was specific performance, the court determined that the petition for a writ of habeas corpus should have been granted. *Id.* at 1161.

Here, the appellate court decision disposes of this claim for relief in one paragraph, which makes no reference to the relevant state law on contract interpretation. This Court, however, has looked through this decision to the superior court's opinion on this issue, which it considers to be the last reasoned decision. The superior court stated that it was not bound by the Ninth Circuit's opinion in *Brown*. Further, although it does not reference the relevant state law on contract interpretation, it does appear that the superior court applied those principles and focused on the plain

language of the plea form to reach its conclusion that Bryant was not promised release after ten

years and, thus, that the decision to deny parole did not violate the terms of his plea agreement.

The Court cannot find that the findings by the superior court or the appellate court are an unreasonable application of clearly established federal law.  Unlike the plea form in the *Buckley* case, the plea form in this case clearly reflects the indeterminate nature of Bryant's sentence.  (Pet., Ex. C, ¶ 10 (maximum possible sentence is "15 years to life (parole after 10 years with credit under law for time served in the County Jail since his arrest)".)  Further, there was nothing in the plea agreement to support Bryant's contention that the prosecutor promised he would be released on parole after ten years.  (Pet., Ex. C, ¶ 12.)  The only promise the parties listed was that the "Defendant to be charged with no other offense arising out of this case."  (*Id.*)

Bryant's argument hinges on the parenthetical referencing "parole after ten years," which he claims meant that he *would be released* after ten years.  Bryant also submits a declaration by his trial counsel in support of his contention that the parties to his plea agreement understood that he would be released after serving ten years.  (Pet., Ex. D.)  Yet even the attorney states in his declaration that it was merely the parties "understanding" that Bryant would be released at "approximately" ten years.  (*Id.*)  This statement of the other party's intent is far from the explicit promise from the prosecutor, on the record, as was present in *Brown*.

Accordingly, the Court concludes that Bryant is not entitled to habeas relief on this claim.

**E.      The Decision to Deny Bryant Parole Did Not Violate His Due Process Rights.**

Bryant asserts that the former Governor's decision to reverse the Board's grant of parole violated his due process rights.  "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards."  *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to

**United States District Court**
For the Northern District of California

1    grant or deny parole. *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1129 (9th Cir. 2006);

2    *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).[3]

3          **1.     Bryant Has a Constitutionally Protected Liberty Interest in Parole.**

4            The state appellate court's opinion suggests that it concluded that Bryant does not have a

5    constitutionally protected liberty interest in parole. (Answer, Ex. 7.) However, it also applied the

6    "some evidence" standard to when it evaluated whether the former Governor's decision satisfied

7    Bryant's due process rights. (*Id.*) Thus, it appears that the state appellate court did not rely on its

8    finding that Bryant does not have a constitutionally protected liberty interest in denying his petition.

9    For the reasons already described in this Court's order denying Respondent's motion to dismiss, this

10   Court holds that Bryant does have a federally protected liberty interest in parole. (*See* Docket No.

11   14.) Accordingly, the Court now must decide whether the California Court of Appeal's decision was

12   contrary to, or involved an unreasonable application of, the "some evidence" standard.

13         **2.     The State Appellate Court's Decision Was Not an Unreasonable Application of**
14               **the "Some Evidence" Standard.**

15           Bryant does not contend that he was denied an opportunity to be heard or that he was not

16   provided with the former Governor's reasons for denying parole. As such, the state appellate court

17   only needed to decide whether there was some evidence having some indicia of reliability to support

18   the former Governor's decision. *See Sass*, 461 F.3d at 1128-29; *see also Biggs*, 334 F.3d at 915.

19   When the Governor reviews the Board's decision, his decision also must reflect consideration of

20   each inmate's particular circumstances. *See, e.g., Rosenkrantz*, 29 Cal. 4th at 677 (finding that the

21   Governor's decision "must reflect an individualized consideration of the specified criteria and

22   cannot be arbitrary and capricious").

23           The Supreme Court has explained that compliance with the "some evidence" standard "does

24   not require examination of the entire record, independent assessment of the credibility of witnesses,

25   or weighing of the evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Sass*, 461 F.3d at

26   1128 (noting "*Hill*'s some evidence standard is minimal and assures that 'the record is not so devoid

27

28          [3]     Respondent argues that the "some evidence" standard is not clearly
established federal law. The *Sass* court rejected that argument. *Sass*, 461 F.3d at 1129.

United States District Court

For the Northern District of California

of evidence that the findings of the disciplinary board were without support or otherwise

arbitrary'"). Rather, the Court is required only to determine whether there is any evidence in the

record that could support the Board's decision. *Hill,* 472 U.S. at 445.

Three Ninth Circuit cases provide guidance for applying the "some evidence" standard to

unchanging circumstances such as the commitment offense and criminal history. In *Biggs*, the Ninth

Circuit stated that the "some evidence" standard may be considered in light of the Board's decision-

making process over time. The *Biggs* court also noted that the Board's decision to deny parole "is

one of 'equity and requires a careful balancing and assessment of the factors considered," and that

"in the present instance, the parole board's sole supportable reliance on the gravity of the offense

and conduct prior to imprisonment to justify denial" did not violate Biggs' due process rights. 334

F.3d at 917. The Ninth Circuit also stated that:

> [o]ver time, however, should Biggs continue to demonstrate exemplary
> behavior and evidence of rehabilitation, denying him a parole date simply
> because of the nature of his offense would raise serious questions involving
> his liberty interest. ...
>
> A continued reliance in the future on an unchanging factor, the circumstance
> of the offense and conduct prior to imprisonment, runs contrary to the
> rehabilitative goals espoused by the prison system and could result in a due
> process violation.

*Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense might,

in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set'

under 'uniform term principles, and might thus also contravene the inmate's constitutionally

protected expectation of parole"); *Rosenkrantz*, 29 Cal. 4th at 682-83 ("[t]he nature of the prisoner's

offense, alone, can constitute a sufficient basis for denying parole" but might violate due process

"where no circumstances of the offense reasonably could be considered more aggravated or violent

than the minimum necessary to sustain a conviction for that offense").

In issuing the note of caution in *Biggs* regarding continued reliance on unchanging factors,

the Ninth Circuit gave little guidance to district courts as to how they should evaluate such a claim.

Nor did the *Sass* court's decision provide any further guidance, other than to note that "[u]nder

AEDPA it is not our function to speculate how future parole hearings could proceed." *Sass*, 461

United States District Court

For the Northern District of California

1    F.3d at 1129.  Like the *Biggs* court, the *Sass* court found that the Board is not precluded from relying

2    on unchanging factors in determining parole suitability.  *Id.*

3    More recently, in the *Irons* case, *supra*, the Ninth Circuit reiterated its finding that the nature

4    of the commitment offense alone can provide "some evidence" to support a decision to deny parole,

5    "where the Board can 'point to factors beyond the minimum elements of the crime for which the

6    inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing,

7    present a danger to society if released."  *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th at

8    1071).  As set forth in the court's opinion, following an argument over a suspected theft of drugs,

9    Irons "fired 12 rounds into Nicholson [his housemate] and, after Nicholson complained that he was

10   in pain, stabbed him twice in the back.  He then wrapped Nicholson's body in a sleeping bag and left

11   it in the room for the ten days it took him to procure a car.  Irons then took the body to the coast,

12   weighted it down, and disposed of it in the ocean."  *Id.* at 849.  The court concluded that the facts

13   underlying Irons' offense supported a finding that it "'was carried out in a manner which

14   demonstrates an exceptionally callous disregard for human suffering,'" and also demonstrated that

15   "the 'motive for the crime is inexplicable or very trivial in relation to the offense.'"  *Id.* at 853

16   (quoting 15 Cal. Code Regs. § 2402(c)(1)(D), (E)).  Thus, the court concluded that the state court

17   had not unreasonably applied the "some evidence" standard articulated in *Hill.*

18   *Irons* also provides some additional guidance on the Ninth Circuit's statement in *Biggs* that

19   continued reliance on the unchanging nature of the offense might, at some point in the future, violate

20   due process.  The court noted that when it had determined that "a parole board's decision to deem a

21   prisoner unsuitable for parole solely on the basis of his commitment offense comport[ed] with due

22   process, the decision was made before the inmate had served the minimum number of years required

23   by his sentence."  *Id.*  The court concluded that "[a]ll we held in [*Biggs* and *Sass,*] and all we hold

24   today, therefore, is that, given the particular circumstances of the offenses in these cases, due

25   process was not violated when these prisoners were deemed unsuitable for parole prior to the

26   expiration of their minimum terms."  *Id.* at 853-54.  The *Irons* court further "expressed its hope that

27   the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's

28   commitment offense, regardless of the extent of his rehabilitation, will at some point violate due

18

United States District Court

For the Northern District of California

1    process, given the liberty interest in parole that flows from the relevant California statutes." *Id.* at

2    854.

3    　　　The lessons this Court draws from *Biggs*, *Sass*, *Irons, Dannenberg, Rosencrantz*, and various

4    district court opinions that have applied the principles articulated therein,[4] are as follows: (1) that the

5    Board or the Governor may properly consider the nature of the commitment offense to determine

6    whether or not a prisoner is suitable for parole; (2) that in certain instances the nature of the offense

7    alone may support a finding that the prisoner is unsuitable for parole; and (3) at some unspecified

8    point, the nature of the offense will no longer be of sufficient predictive value in determining

9    whether or not a prisoner poses too great a risk of danger to be considered suitable for parole.

10   　　　As set forth above, in his February 2003 decision, former Governor Davis found Bryant

11   unsuitable for parole because of (1) the nature of the commitment offense; (2) his social and criminal

12   history; (3) his lack of remorse; (4) his need for further therapy to face, understand and cope with

13   stress in a nondestructive manner; and, (5) his inadequate parole plans.  In denying Bryant's due

14   process claim, the state appellate court relied solely on the nature of the commitment offense and

15   cited *Rosenkrantz* for the proposition that the commitment offense alone can constitute a sufficient

16   basis for denying parole.  (Answer, Ex. 7.)  The court explained its reasoning as follows:

17

18   ────────────

19   　　　[4]    *See, e.g.*, *McCullough v. Kane*, 2007 WL 1593227, *6, 9 (N.D. Cal. June 1,
     2007) (finding due process violation in Governor's reversal of the Board's decision to grant
20   parole after petitioner had served twenty-one years of fifteen years to life sentence for second
     degree murder and met circumstances tending to indicate suitability for parole); *Brown v.
21   Kane*, 2007 WL 1288448, *1 (N.D. Cal. May 2, 2007) (finding due process violation in
     Governor's reversal of the Board's decision to grant parole at tenth parole suitability hearing
22   after petitioner had served twenty-four years of fifteen years to life sentence for second
     degree murder and met circumstances tending to indicate suitability for parole); *Fowler v.
23   Butler*, 2007 WL 1555726, *9 (E.D. Cal. May 23, 2007) (finding due process violation in
     Governor's reversal of Board's decision to grant parole based on the commitment offense,
     insufficient self-help or therapy, and psychiatric reports); *Pirtle v. Cal. Bd. of Prison*, 2007
24   WL 1140817, *3 (E.D. Cal. Apr. 17, 2007) (finding due process violation in Board's denial
     of parole based on petitioner's commitment offense, criminal record, unstable social history,
25   failure to upgrade vocationally, and need for further therapy to cope with stress); *Thomas v.
     Brown*, 513 F. Supp. 1224 (N.D. Cal. 2006) (finding due process violation in Governor's
26   reversal based on petitioner's commitment offense, his failure to accept responsibility, his
     need for further therapy, and his criminal history); *Johnson v. Finn*, 2006 WL 195159, *8-12
27   (E.D. Cal. Jan. 19, 2006) (finding due process violation in Governor's reversal of Board's
     granting of parole based on the petitioner's commitment offense, his unstable social history,
28   his failure to take sufficient responsibility for his crime, and his need for additional therapy
     to understand the magnitude of his offense).

United States District Court

For the Northern District of California

1

2

3

4

5

6

> The facts of the crime support the decision [that] the crime was especially heinous. The facts of the crime, taken from the Board's transcripts are: Bryant went to his ex-wife's home armed with a knife. He knew her current husband planned to report him to authorities for an alleged rape. When the husband left the house for work, Bryant stabbed him 13 times and crushed his head with a large rock. Bryant asked his ex-wife if he could wash up in the bathroom because he had been in an accident. He left the man to die on the side of the home without telling his ex-wife. "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations]" (*In re Rosenkrantz*, ... , 29 Cal. 4th, 616, 682.)

7

(Answer, Ex. 7.)

8

9

10

11

12

13

14

15

16

17

In this case, the Court is not free to review the record *de novo*. Rather, it must look only to whether the state appellate court's decision was contrary to or an unreasonable application of clearly established federal law. Given that the facts underlying Bryant's offense are sufficiently similar in degree to the facts in *Irons*, the Court cannot conclude that the state court's decision unreasonably applied the some evidence standard. It would not be unreasonable to conclude that the facts set forth above demonstrate an exceptionally callous disregard for human suffering, which is one factor to consider in evaluating whether the offense was carried out in an "especially heinous, atrocious or cruel manner." *See* 15 Cal. Code Regs. § 2402(c)(1)(D).[5] Thus, there was some evidence to support the former Governor's decision and the state appellate court did not unreasonably apply the some evidence standard in its review of that decision.

18

19

20

21

22

23

24

Although the Court concludes that the state court did not unreasonably apply the some evidence standard, unlike the defendants in *Biggs, Sass,* and *Irons*, Bryant has, in fact, served the minimum number of years to which he was sentenced. Indeed he had served twenty-two years, seven years over the minimum term, at the time the former Governor denied parole. As *Irons* and *Biggs* concluded, at some point the commitment offense raises serious due process concerns because the unchanging nature of the offense is not predictive of the petitioner's suitability for parole. *Irons*, 505 F.3d at 854; *Biggs*, 334 F.3d at 916-17. Again, the Court cannot say that the state court's

25

26

27

28

---

[5]    Although the state court did not explicitly mention it, the record further indicates that the "victim's face was 'badly distorted and flattened,'" after Bryant crushed the victim's skull with a heavy rock. This fact suggests that the victim was mutilated, which is another factor to consider in evaluating whether the offense was carried out in an "especially heinous, atrocious or cruel manner." *See* 15 Cal. Code Regs. § 2402(c)(1)(C).

conclusion that Bryant's time has not yet come is contrary to or an unreasonable application of clearly established federal law.

Accordingly, Bryant is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. A separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: December 13, 2007

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California